CHAMPS CONVENIENCE STORES, INC. AND COMMERCIAL UNION INSURANCE COMPANY, PLAINTIFFS v. UNITED CHEMICAL COMPANY, INC., DEFENDANT

No. 8928SC672

(Filed 3 July 1990)

**Sales § 22.2 (NCI3d) — floor cleaner ordered — automotive cleaner delivered — use by plaintiff contributory negligence**

Plaintiff store owner's recovery in a products liability action based on negligence was barred by N.C.G.S. § 99B-4 because plaintiff's employee was contributorily negligent as a matter of law where the evidence showed that plaintiff's employee ordered a floor cleaner from defendant; defendant instead delivered a cleaner for automobile parts; the employee conceded that she did not read the name of the product delivered or the directions for its use, both of which were printed on the label; she also conceded that if she had read the label she would not have applied the parts cleaner to the floor; and although the employee and her co-worker commented on the "bad odor" of the product, neither of them checked the label before continuing to mop it on the floor.

Am Jur 2d, Products Liability §§ 702, 934.

Judge LEWIS dissenting.

APPEAL by defendant from Judgment of *Judge Charles C. Lamm, Jr.,* entered 19 January 1989 in BUNCOMBE County Superior Court. Heard in the Court of Appeals 6 December 1989.

*Roberts Stevens & Cogburn, P.A., by Isaac N. Northup, Jr., for plaintiff appellees.*

*Morris, Bell & Morris, by William C. Morris, III, for defendant appellant.*

COZORT, Judge.

This product liability action has its origin in mistake and unhappy coincidence. Marta Sprinkle, an employee of plaintiff Champs Convenience Stores, Inc., ordered from the defendant a product named Dust Command, used for controlling dust on wooden floors. The defendant, however, delivered a product named Carbo-Solv, used for cleaning carburetors and other small parts of combustion engines. Both Dust Command and Carbo-Solv were distributed by the defendant in five-gallon containers. On 31 August 1987, without reading the label, Sprinkle and another employee mopped Carbo-Solv on the floor of Miller's Grocery, one of the plaintiffs' convenience stores. On 4 September 1987, the Food and Drug Protection Division of the North Carolina Department of Agriculture embargoed the entire contents of the store. Plaintiff eventually closed the store.

On 10 December 1987, the plaintiffs sued, alleging, among other things, that the defendant "[n]egligently delivered a toxic chemical to plaintiff representing to plaintiff that this product was suitable for cleaning the floors of Miller's Grocery." The defendant answered and asserted, among other defenses, contributory negligence by the plaintiffs. At trial, the jury found defendant was negligent, found no contributory negligence by plaintiffs' employee, and awarded plaintiffs $148,000 in damages. The defendant moved alternatively for judgment notwithstanding the verdict or a new trial. The trial court denied that motion.

The defendant contends on appeal that the trial court erred in denying its motions for a directed verdict and for judgment notwithstanding the verdict. We agree.

In initiating this action the plaintiff sought relief based on theories of negligence and breach of contract. The negligence claim was grounded in the delivery of the wrong product. The breach of contract claim was grounded in Marta Sprinkle's conversation

CHAMPS CONVENIENCE STORES v. UNITED CHEMICAL CO.

[99 N.C. App. 275 (1990)]

with Bill Robinson, an employee of the defendant, regarding the type of product she needed. Based on the evidence brought forward at trial, however, the liability issues submitted to the jury dealt exclusively with negligence:

1. Were the plaintiffs, Champs Convenience Stores, Inc. and Commercial Union Insurance Company, injured or damaged by the negligence of the defendant, United Chemical Company, Inc.?

2. Did the plaintiffs' employee, Marta Sprinkle, by her own negligence contribute to plaintiffs' injury or damage?

Marta Sprinkle testified that she called United Chemical and spoke with a Bill Robinson:

Q Tell us about your conversation with Mr. Robinson, please.

A Well, I told him who I was and where I worked, and I said, "We need something to put on some wood floors to control the dust." And I told him that my boss man said it was "dust-something or other," and that's all I knew.

Q What did Mr. Robinson say to you?

A He said, "Did you say 'Miller's Grocery' in Haw Creek?" And I said, "Yes." And he said, "We used to sell to the previous owner."

Q And did he tell you what he used to sell?

A He said it was Dust Command.

* * * *

Q Did you ask him what size he thought you needed?

A Yes. He said, "How long has it been? Have you put it down recently?" And I told him I had no idea when the last time was anything was put on the floor.

Q So did he tell you how much he thought you needed?

A He told me he thought it would take about five gallons.

Q And did he tell you whether the product came in the five-gallon size?

A Yeah; it came in a five-gallon bucket.

Q Did you talk to him any more about Dust Command?

A Yes, I did.

Q What else did you ask him and what else did he tell you?

A Well, I asked him about—if I had to close the store to put it down, and he said he would advise it because it kind of made the floor slick. He asked me what our hours were, and I told him, and he told me to close when I closed, just go ahead and mop it down and then lock the door and go home and we'd go right back into business the next morning.

Q Did you ask anything about whether you needed any special equipment?

A Yes, sir, I did. I asked him how to put it down, if we had to have something special to put it down with. He asked me if we had any old mops, because he said, "You'll have to throw them away when you get through." I told him we had some old mops. So he told us just to—I said, "Do you have to have buckets or any kind of buffer or anything?" He said, "No, just open the bucket and put the mops in it and mop it down." He said, "Don't wring it out," because he said, "You don't need to get it on your hands or anything."

She testified further that, when she and a co-worker mopped the floor with the product, they "commented that it had a bad odor."

On cross-examination Ms. Sprinkle testified as follows:

Q And then later a five-gallon container was delivered, which you've identified as this one right in front of me, along with an invoice that said "Dust Command" on it; right?

A That's correct.

Q And, in fact, you even had a question about the product that the delivery man could not answer for you?

A That's correct.

Q But you never consulted the label yourself to try to answer that question after the delivery man left, did you?

A No, I did not.

Q And you had never used Dust Command before?

A No, I had not.

Q And certainly had never read a Dust Command label to find out what the directions said on a Dust Command label?

A No, I had not.

* * * *

MR. MORRIS, III.: Let me just put this up here so you can refer to it.

(Black bucket was placed next to the witness on the stand.)

Q Now, then, that label contains directions for use, does it not?

A Yes, it does.

Q Okay. And you can, of course, read?

A Yes, I can.

Q I believe over there on the right side of the label are the directions; is that right?

A Yes.

Q Okay. The name of the product is on the label, and it says "Carbo Solve?" [sic]

A Yes, it does.

Q And beneath that it says "cold parts and carburetor cleaner," doesn't it?

A Yes, it does.

Q And then under the description it says "Description: An economical monophase and cold parts cleaner. Cleans a variety of equipment used in combustion engines such as small parts, rocker arms, carburetors, pistons, et cetera, as well as transmissions and brake housings and components," doesn't it?

A Yes, it does.

Q Now, then, I believe you testified in your deposition, which was June of 1988; do you remember that?

A Yes, I do.

* * * *

Q Just to clarify that, you were given a copy of the label at the deposition; correct?

A Right.

Q And at that time you read the label?

A Yes, I did.

Q And when you read the label at the deposition, you realized that it was a product for cleaning car parts?

A Yes, sir.

Q And you also realized, after reading the label at your deposition, that it was not a product — not a floor cleaner?

A That's correct.

Q Now, I believe you testified in your deposition that if you had read the label before you applied this Carbo Solve, [sic] you would not have applied it to the floor?

A That's correct.

Q And as the manager of Miller's Grocery, it was your practice to make sure that the invoices for deliveries matched the product that was delivered?

A That's correct.

Q I believe you even said that you always compared the invoice to the product delivered to make sure that they matched?

A That's correct.

Q But that you did not do that on the occasion that Carbo Solve [sic] was delivered to Miller's Grocery?

* * * *

A No, I did not.

At the close of the plaintiffs' evidence, the defendant moved for a directed verdict on the plaintiffs' breach of warranty claim. The trial court granted that motion. The defendant also moved for a directed verdict on the plaintiffs' negligence claim. That motion was denied. We find the trial court erred in denying that motion.

CHAMPS CONVENIENCE STORES v. UNITED CHEMICAL CO.

[99 N.C. App. 275 (1990)]

This case is governed by North Carolina's Products Liability Act. N.C. Gen. Stat. §§ 99B-1, *et seq.* (1989). N.C. Gen. Stat. § 99B-1(3) provides that a

"Product liability action" includes any action brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, testing, listing, certifying, warning, instructing, marketing, *selling*, advertising, packaging or labeling of any product. [Emphasis added.]

The verb sell means "to deliver . . . offer, present . . . to give up [property] to another for money or other valuable consideration." Webster's Third New International Dictionary of the English Language Unabridged 2061 (1966). In this case we hold that "selling" encompasses delivery of products and that plaintiffs' action falls within the scope of a "product liability action."

N.C. Gen. Stat. § 99B-4 provides in part that

No manufacturer or seller shall be held liable in any product liability action if:

(1) The use of the product giving rise to the product liability action was contrary to any express and adequate instructions or warnings delivered with, appearing on, or attached to the product or on its original container or wrapping, if the user knew or with the exercise of reasonable and diligent care should have known of such instructions or warnings; provided, that in the case of prescription drugs or devices the adequacy of the warning by the manufacturer shall be determined by the prescribing information made available by the manufacturer to the health care practitioner; or

* * * *

(3) The claimant failed to exercise reasonable care under the circumstances in his use of the product, and such failure was a proximate cause of the occurrence that caused injury or damage to the claimant.

When, as in the case below, a product liability action is "founded on negligence, '[t]here is no doubt that [plaintiff's] contributory negligence will bar his recovery to the same extent as in any

other negligence case.'" *Smith v. Fiber Controls Corp.*, 300 N.C. 669, 672, 268 S.E.2d 504, 506 (1980) (quoting Prosser, Law of Torts § 102 (4th ed. 1971)). Moreover, the "Products Liability Act specifically reaffirms the applicability of contributory negligence as a defense in product liability actions." *Id.* at 678, 268 S.E.2d at 510.

At trial Ms. Sprinkle conceded (1) that she did not read the name of the product delivered or the directions for its use, both of which were printed on the label, and (2) that if she had read the label she would not have applied Carbo-Solv to the floor. She also testified that, although she and her co-worker commented on the "bad odor" of the product, neither of them checked the label before continuing to mop it on the floor.

There is certainly ample evidence to support the jury's finding that defendant was negligent in delivering the wrong product. Nevertheless, Ms. Sprinkle's testimony conclusively establishes that the product delivered was labeled with "express and adequate instructions" and that her failure to read the product's name or the directions for its use "was a proximate cause of the occurrence that caused injury or damage to the claimant." N.C. Gen. Stat. § 99B-4(1) and (3) (1989). Consequently, plaintiffs' recovery in this product liability action grounded in negligence is barred by § 99B-4 because plaintiff's employee was contributorily negligent as a matter of law.

We note that our holding is limited to the peculiar facts presented by the case below. We do not imply that in all circumstances failure to read a product's label is contributory negligence as a matter of law. *See*, for example, *Ziglar v. E.I. DuPont Co.*, 53 N.C. App. 147, 280 S.E.2d 510, *disc. review denied*, 304 N.C. 393, 285 S.E.2d 838 (1981), where this Court found summary judgment improper for the defendant where a farm laborer, without reading the label, consumed a highly toxic clear liquid packaged in a translucent one-gallon container similar to a plastic milk jug.

For the reasons stated above, the denial of defendant's motion for directed verdict is reversed and the cause remanded for entry of directed verdict.

Reversed and remanded.

Judge JOHNSON concurs.

Judge LEWIS dissents.

Judge LEWIS dissenting.

I respectfully dissent.

The Carbo-Solv arrived in a five gallon can as expected with an invoice reciting that the product ordered had arrived. Bill Robinson told the plaintiffs' agents how to apply the material, leaving little reason to consult the label. In *Ziglar, supra,* the product had a distinct and unpleasant odor ("like rotten eggs"). Here, the odor was also distinct and unpleasant. Nevertheless, the Supreme Court, in *Ziglar,* stated "[w]e further hold that the defense of contributory negligence was not established in this case as a matter of law." *Id.* at 160. For us to reverse this judgment and direct entry of judgment for the defendant is contrary to *Ziglar* and G.S. 2D § 99B-4. I believe that the adequacy of the label and the proximate cause of the injury in this case are issues of fact for the jury. After a full trial on all of the issues, the jury found negligence on the part of the defendant and no contributory negligence by the plaintiff. I find no error.