CHAMPS CONVENIENCE STORES, INC. AND COMMERCIAL UNION IN-
SURANCE COMPANY v. UNITED CHEMICAL COMPANY, INC.

No. 350A90

(Filed 14 August 1991)

1. **Sales § 22 (NCI3d) — ordinary negligence or product liability
negligence — contributory negligence applicable**

   Whether this action is one based on ordinary negligence
   or a products liability action based on a theory of negligence,
   contributory negligence is applicable as a defense. N.C.G.S.
   § 99B-4(1) and (3) merely codify the doctrine of contributory
   negligence in products liability actions.

   **Am Jur 2d, Products Liability §§ 908, 931.**

2. **Sales § 22.2 (NCI3d) — products liability action — contributory
negligence — proposed instruction incorrect**

   The trial court did not err in failing to give defendant's
   proposed instruction on contributory negligence in a products
   liability action where the proposed instruction did not correct-
   ly state the law of contributory negligence in such an action
   because it failed to instruct the jury on the requirement that
   the instructions or warnings on the product must be adequate
   and failed to instruct the jury that it is to consider whether
   plaintiff exercised reasonable care even though failing to read
   the instructions or warnings. Furthermore, whether the action
   was one based on ordinary negligence or was a products liabili-
   ty action based on negligence, the instructions given by the
   court accurately reflected the law of contributory negligence
   as applicable to this case. N.C.G.S. § 99B-4(1).

   **Am Jur 2d, Products Liability § 945.**

3. **Sales § 22.2 (NCI3d) — failure to read label and instructions —
no contributory negligence as matter of law**

   The evidence did not disclose contributory negligence as
   a matter of law by the manager of plaintiff's store in failing
   to read the label on a product delivered by defendant before
   mopping it onto the floor of plaintiff's store but presented
   a question for the jury on that issue where it tended to show
   that plaintiff's manager ordered Dust Command, a dust control
   cleaner, from defendant by telephone; during their telephone

conversation, defendant's employee gave plaintiff's manager correct instructions for Dust Command; when the product arrived, plaintiff's manager checked the invoice which indicated that she was receiving Dust Command; the product actually delivered by defendant was Carbo-Solv, a carburetor cleaner; the product arrived in a five-gallon container as defendant's employee had described over the telephone; plaintiff's manager admitted that she did not look at the label on the container or read the instructions before applying the product; and plaintiff's manager further admitted that had she read the instructions she would not have applied the product. Whether plaintiff's manager could reasonably rely on the instructions given over the telephone and on the invoice was a jury question.

**Am Jur 2d, Products Liability §§ 928, 962.**

4. **Witnesses § 8 (NCI3d) — cross-examination — term used on direct examination**

Where a witness testified on direct examination by defendant that plaintiff did not have a license to operate a meat market but continued to operate a meat market in a store it bought as an existing facility, plaintiff was properly allowed to inquire about this testimony on cross-examination in order to have the witness explain what he meant when he referred to operation of the meat market as an "existing facility."

**Am Jur 2d, Witnesses §§ 464 et seq.**

5. **Actions and Proceedings § 13 (NCI4th); Damages § 41 (NCI4th) — lost profits — absence of business license**

Plaintiff was not prevented from recovering lost profits from the operation of a meat market in its grocery store which was closed as a result of defendant's negligence even though no license to operate the meat market was ever issued in plaintiff's name, since the failure to obtain a business license is not a valid defense to a tort action. Therefore, plaintiff was not required to separate profits derived from the operation of the meat market from profits derived from the operation of the rest of the grocery store in order to prove the lost profits with reasonable certainty.

**Am Jur 2d, Products Liability § 970.**

CHAMPS CONVENIENCE STORES v. UNITED CHEMICAL CO.

[329 N.C. 446 (1991)]

6. **Damages § 41 (NCI4th)— note payments as damages—no double recovery**

Although note payments made by plaintiff while its grocery store was closed as a result of defendant's negligence were not specifically denominated as "note payments" under the expense column of plaintiff's income statement when computing lost profits, plaintiff's recovery of the note payments as a separate item of damages did not constitute a double recovery where amortization and depreciation expenses for goodwill and equipment which were deducted as expenses in arriving at lost profits reflected the component parts of the note payments.

**Am Jur 2d, Products Liability § 970.**

7. **Damages § 41 (NCI4th)— tort action—overhead expenses as damages**

Reasonable overhead expenses for rent and note payments made by plaintiff while its grocery store was closed for repairs as a result of defendant's negligence could be recovered as damages by plaintiff along with its lost profits in its tort action against defendant.

**Am Jur 2d, Products Liability § 970.**

8. **Damages § 161 (NCI4th)— mitigation of damages—failure to give requested instruction—no error**

The trial court did not err in failing to give defendant's requested instruction on mitigation of damages where the substance of the requested instruction was given when the court charged the jury that "the law allows plaintiff to be compensated for a reasonable period of time that Miller's Grocery needed to be closed to make necessary repairs."

**Am Jur 2d, Products Liability § 970.**

Justice MEYER concurring.

ON appeal and writ of certiorari to review the decision of a divided panel of the Court of Appeals, 99 N.C. App. 275, 392 S.E.2d 761 (1990), both reversing an order entered by Lamm, J., on 6 February 1989 in the Superior Court, BUNCOMBE County, denying defendant's motion for a directed verdict and remanding the case for entry of a directed verdict for defendant. Heard in the Supreme Court 11 March 1991.

## CHAMPS CONVENIENCE STORES v. UNITED CHEMICAL CO.

[329 N.C. 446 (1991)]

*Roberts Stevens & Cogburn, P.A., by Isaac N. Northup, Jr., for plaintiff-appellants and -appellees.*

*Morris, Bell & Morris, by William C. Morris, III, for defendant-appellant and -appellee.*

FRYE, Justice.

In this appeal we consider whether the Court of Appeals erred in determining that this action is a products liability action and thus covered by the provisions of N.C.G.S. § 99B and in determining that plaintiff's employee, under the facts of this case, was contributorily negligent as a matter of law. Defendant also raises five issues on cross-appeal dealing with jury instructions and the amount of damages awarded plaintiff. We conclude that the jury instructions given in this case make it unnecessary to decide whether the provisions of § 99B, more specifically the defenses found in § 99B-4, apply to the facts of this case, and we further conclude that the Court of Appeals erred in its determination that plaintiff's employee was contributorily negligent as a matter of law. We also conclude that none of the issues raised by defendant on cross-appeal have any merit.

Plaintiff Champs Convenience Stores, Inc., operated a small grocery store called Miller's Grocery. Plaintiff purchased Miller's Grocery on 8 May 1987 and in July 1987 hired Marta Sprinkle to manage the operation of the store. In August 1987, Sprinkle told Jim Hanvey, the president of plaintiff corporation, that she was having trouble keeping dust off the merchandise in the store. Hanvey told her to call defendant United Chemicals Company, Inc.

When Sprinkle called defendant on 31 August 1987, she spoke with an employee, Bill Robinson, and told him that she needed something to put on the wood floors of the grocery store to control the dust. According to Sprinkle's testimony at trial, "I told him that my bossman said it was 'dust-something or other,' and that was all I knew." Robinson, after inquiring if she was calling from Miller's Grocery, told her that defendant had sold a product known as Dust Command to the previous owners. Sprinkle asked Robinson what size container it came in, and he replied that it came in both one-gallon and five-gallon containers. Robinson, after asking when the product had last been applied, suggested that Sprinkle purchase a five-gallon container.

Sprinkle asked Robinson how to apply the Dust Command. He told her that she would have to close the store to put it down, but she could put it down after the store closed that evening, and the store could be reopened the next morning as usual. He also told her that she needed to apply the product with old mops because she would have to throw the mops away after using them to apply the product. When Sprinkle asked if she needed a special bucket to use, Robinson replied that she could just open the container the product came in and apply it directly from that container. He also suggested that she not wring out the mops because she should not get the product on her hands.

About thirty minutes after Sprinkle called defendant, a delivery person arrived at Miller's Grocery with a five-gallon black bucket. The delivery person told Sprinkle that he was from United Chemical and that he had brought the Dust Command she ordered. Sprinkle asked him to put it down in the corner so that it would not be in the way of the customers, and she asked him a question about the product. The delivery person looked at the bucket and told her that he could not answer her question. He then gave her the invoice; she looked at the invoice, signed it, and paid him. The invoice, presented as an exhibit at trial, listed the product delivered as Dust Command.

After closing the store at the usual time that evening, Sprinkle and Steve Creaseman, another employee of the store, began to apply the product which had been delivered that day. Sprinkle admitted at trial that she never read the label of the product which was delivered and did not know that the product she was using was actually Carbo-Solv which defendant had mistakenly delivered in place of the Dust Command Sprinkle had ordered. Sprinkle did not read the directions and warnings on the label until she was asked to read the label during a deposition. During the deposition, she also admitted that she would not have applied the Carbo-Solv to the floor of the grocery store if she had known what it was.

As Sprinkle and Creaseman were applying the contents of the bucket, they noticed that it had a strong, unpleasant odor, and they commented to each other about the odor but continued to apply the product. When she arrived the next morning to open the store, Sprinkle noticed that the unpleasant odor was still present in the store. The other workers and the customers at the

store complained about the odor. Several customers who purchased food from the grocery store that day returned the food because it contained the same odor as the store, and they did not want to eat it. The next day, 2 September 1987, the store was closed, and the North Carolina Department of Agriculture issued an embargo for the contents of the store, which meant that the merchandise in the store could not be sold or moved until the matter was resolved. About one-half of the contents of the store were salvageable, and the remaining merchandise had to be thrown away because it was unsafe for consumption as a result of the exposure to the fumes from the Carbo-Solv. Plaintiff began the process of cleaning up the store so that it could be reopened, and this clean up continued until the store was sold in July 1988.

Plaintiff filed a complaint on 10 December 1987 alleging that defendant negligently delivered a toxic chemical, Carbo-Solv, to plaintiff and represented to plaintiff that the product was suitable for cleaning the floors of Miller's Grocery. A jury trial was held in Buncombe County Superior Court beginning on 17 January 1989, and the case was tried as a negligence action. At trial, in addition to the evidence already discussed above, plaintiff presented evidence of damages in the form of lost profits during the clean up period and ongoing expenses incurred by Miller's Grocery while the store was closed for the clean up. Three issues were submitted to the jury, and the jury, finding that defendant was negligent and plaintiff's employee was not contributorily negligent, awarded plaintiff $148,000 in damages. Judgment was entered on 19 January 1989 and was filed on 23 January 1989. On 24 January 1989, defendant moved for judgment notwithstanding the verdict and alternatively for a new trial. Both of these motions were denied, and defendant filed notice of appeal on 31 January 1989.

The Court of Appeals reversed the judgment of the trial court, reversed the denial of defendant's motion for directed verdict, and remanded the case for entry of a directed verdict in favor of defendant. *Champs Convenience Stores, Inc. v. United Chemical Co., Inc.,* 99 N.C. App. 275, 392 S.E.2d 761 (1990). Plaintiff gave notice of appeal to this Court based on the dissent of Judge Lewis. Defendant also filed with this Court a petition for writ of certiorari as to additional issues raised at the Court of Appeals but not addressed by the Court of Appeals in its opinion because of its decision in favor of defendant. On 8 November 1990, this Court granted defendant's petition for review of these additional issues.

Although not briefed by the parties, plaintiff raised the issue during oral argument as to whether the Court of Appeals correctly concluded that this was a products liability action. However, we find that a decision on this issue is not necessary to the resolution of this appeal. The first issue is more properly framed as whether the jury instructions given by the trial judge on contributory negligence were accurate. Defendant contends that the instructions should reflect the defense codified in the Products Liability Act at N.C.G.S. § 99B-4(1). We conclude that even if this action is a products liability action, the instructions which the trial court gave in essence reflect the defense found in § 99B-4(1). Thus, it is unnecessary to determine if § 99B applies to this action.

[1] Section 99B-4 provides in part:

No manufacturer or seller shall be held liable in any product liability action if:

(1) The use of the product giving rise to the product liability action was contrary to any express and adequate instructions or warnings delivered with, appearing on, or attached to the product or on its original container or wrapping, if the user knew or with the exercise of reasonable and diligent care should have known of such instructions or warnings; . . .

. . . .

(3) The claimant failed to exercise reasonable care under the circumstances in his use of the product, and such failure was a proximate cause of the occurrence that caused the injury or damage to the claimant.

N.C.G.S. § 99B-4 (1989). This Court has previously addressed the issue of whether the General Assembly, in enacting § 99B, adopted the doctrine of strict liability in products liability actions in this State, and we concluded that § 99B was not a strict liability statute. *Smith v. Fiber Controls Corp.*, 300 N.C. 669, 678, 268 S.E.2d 504, 510 (1980) (cause of action arose before § 99B took effect). Thus, whether this action is one based on ordinary negligence, as the trial court determined, or a products liability action based on a theory of negligence, as the Court of Appeals determined, contributory negligence is still applicable as a defense. *Id.* at 672, 268 S.E.2d at 506. Section 99B-4(1) and (3) merely codify the doctrine of contributory negligence as it applies in actions brought under

§ 99B. *See id.* at 678, 268 S.E.2d at 510 (concluding that § 99B-4(3) is a codification of contributory negligence in a products liability action), and *Lee v. Crest Chemical Co.*, 583 F. Supp. 131 (M.D.N.C. 1984) (concluding that § 99B-4(1) is a codification of contributory negligence in a products liability action). In addition to codifying the general doctrine of contributory negligence, § 99B-4 sets out or explains more specialized fact patterns which would amount to contributory negligence in a products liability action.

[2] Defendant requested that the following instruction on contributory negligence be given:

> On this issue, the burden of proof is on the defendant. This means that the defendant must prove, by the greater weight of the evidence, that the damage suffered by the plaintiffs was a proximate result of the negligence of the plaintiff Champs Convenience Stores, Inc.

> Members of the jury, you will note that I have just used the terms "negligence" and "proximate cause." These terms have the same legal meanings as I have previously given you with respect to the first issue. The law imposes a duty upon the plaintiff Champs Convenience Stores, Inc. to use ordinary care to protect itself, as well as others, from injury. A breach of that duty is called negligence and a breach occurs when a party fails to use ordinary care to protect itself and others from injury.

> Ordinary care means that duty of care which a reasonable and prudent person or party would use under the same or similar circumstances.

> Therefore, if you should find from the evidence, and by its greater weight, that the plaintiff Champs Convenience Stores, Inc. failed to read the label on the product Carbo-Solv and failed to note the directions as to its use and the warnings printed thereon and that such failure or failures were a proximate cause of any damage which the plaintiffs sustained, if any they did sustain, then and in that event, you would answer this issue "yes" in favor of the defendant. If you do not so find, you would answer this issue "no."

Defendant contends in its cross-appeal that the trial court should have given these instructions because they correctly state the defenses contained in § 99B-4. More specifically, defendant claims

that the law in this matter, based on § 99B-4(1), is that failure to read and take heed of information provided with a product is a bar. to the plaintiff's recovery if this failure was the proximate cause of the damage. We conclude that defendant's proposed jury instruction does not fully state the law in that it fails to instruct the jury on the requirement that the instructions or warnings on the product must be adequate and it fails to instruct the jury that it is to consider whether plaintiff exercised reasonable care even though failing to read the instructions or warnings. *See* N.C.G.S. § 99B-4(1) (1989) (if "the use . . . was contrary to any express and *adequate* instructions or warnings . . . if the user knew or with the exercise of reasonable and diligent care should have known of such instructions or warnings") (emphasis added). Therefore, if the instructions themselves were not adequate or if the plaintiff did not read the instructions but the jury determined that plaintiff still exercised reasonable care, the jury should not find contributory negligence on the part of plaintiff. Thus, defendant's proposed instruction did not correctly state the law on contributory negligence in a products liability action.

The trial judge gave the following instruction on the issue of contributory negligence:

On this issue the burden of proof is on the defendant, meaning that the defendant must prove, by the greater weight of the evidence, that the plaintiffs' manager was negligent and that such negligence was a proximate cause of plaintiffs' own property damage. The test of what is negligence, as I have already defined and explained it, is the same for a plaintiff as for a defendant, and when the plaintiffs' employee's negligence concurs with the negligence of the defendant in proximately causing the plaintiffs' property damage, it is called contributory negligence. If the plaintiffs' employee's negligence was a proximate cause of and therefore contributed to plaintiffs' property damage, plaintiffs cannot recover. In this case the defendant contends and the plaintiffs deny that the manager of Miller's Grocery was negligent in that she failed to read the label on the product that was delivered before applying it to the floor. The defendant further contends and the plaintiffs deny that her negligence was a proximate cause of and contributed to the plaintiffs' damage. I instruct you that contributory negligence is not to be presumed from the mere fact of injury or damage.

CHAMPS CONVENIENCE STORES v. UNITED CHEMICAL CO.

[329 N.C. 446 (1991)]

Finally as to this contributory negligence issue on which the defendant has the burden of proof, if you find, by the greater weight of the evidence, that at the time in question the manager of Miller's Grocery was negligent in the way which I have just explained to you, and that such negligence was a proximate cause of and contributed to the plaintiffs' damage, then it would be your duty to answer this issue "yes" in favor of the defendant. On the other hand, if, considering all of the evidence, you fail to find such negligence or proximate cause, then it would be your duty to answer this issue "no" in favor of the plaintiffs.

We conclude that the instruction which the trial judge gave regarding plaintiff's employee's contributory negligence more correctly states the law of contributory negligence than defendant's proposed instruction whether the action is an ordinary negligence action or whether it is a products liability action based on negligence. Contributory negligence has been defined as

the breach of the duty of the plaintiff to exercise due care for his own safety in respect of the occurrence about which he complains, and if his failure to exercise due care for his own safety is one of the proximate contributing causes of his injury, it will bar recovery.

*Holderfield v. Rummage Brothers Trucking Co.*, 232 N.C. 623, 625, 61 S.E.2d 904, 906 (1950). The instruction which was given accurately reflects the law of contributory negligence as defined above. The instruction explained to the jury that defendant contended that Sprinkle's failure to read the label before she applied the product amounted to contributory negligence and that this contributory negligence was the proximate cause of the plaintiff's damage. Furthermore, this instruction accurately reflected the codified version of contributory negligence as found in § 99B-4(1).[1]

---

1. We note that the jury instruction on contributory negligence does not mention whether the instructions or warnings on the container were "adequate" as is mentioned in § 99B-4(1). Defendant does not raise this issue, and the instruction submitted by defendant did not instruct the jury to address whether the instructions or warnings on the container were adequate. However, the failure to instruct the jury as to whether these instructions or warnings were adequate would work in the defendant's favor since the defendant would be responsible for providing adequate instructions or warnings on the container and the jury was not told to focus on this responsibility; the jury was only instructed to focus on the contributory negligence of plaintiff's employee.

Therefore, whether the action was one based on ordinary negligence or was a products liability action based on negligence, the instructions which were given to the jury accurately reflect the law of contributory negligence as applicable to this case.

[3]  Plaintiff next raises the issue of whether the Court of Appeals erred in concluding that plaintiff was contributorily negligent as a matter of law and remanding the case for the imposition of a directed verdict in favor of defendant. The issue of contributory negligence is ordinarily a question for the jury rather than an issue to be decided as a matter of law. *See Lamm v. Bissette Realty, Inc.*, 327 N.C. 412, 395 S.E.2d 112 (1990). Contributory negligence was submitted to the jury, and the jury found for the plaintiff on this issue. We conclude that under the evidence in this case the issue of contributory negligence is for the jury in that there are questions of fact to be decided, and we reverse the Court of Appeals' holding to the contrary.

The testimony in this case was that Sprinkle asked Robinson, defendant's employee, for instructions on how to use the Dust Command she had just ordered. During their telephone conversation, Robinson gave Sprinkle the correct instructions for the use of Dust Command. When the product arrived, Sprinkle checked the invoice which indicated that she was receiving Dust Command. Sprinkle was not familiar with Dust Command, but the product which arrived was in a five-gallon container, just as Robinson had described to her over the telephone. Sprinkle admitted that she did not look at the label on the container before she began applying the product and did not read the instructions. She further admitted that had she read the instructions she would not have applied the product. Nevertheless, we conclude that the evidence was insufficient to require the court to find contributory negligence as a matter of law. It was for the jury to decide whether Sprinkle's failure to read the label on the product amounted to contributory negligence in light of the fact that defendant delivered the wrong product, that Robinson had given her complete instructions on the use of Dust Command during their telephone conversation, and that the invoice indicated that the product delivered was Dust Command. Whether Sprinkle could reasonably rely on the instructions given over the telephone and on the invoice is a jury question, and the trial court properly submitted the question to the jury. The jury having answered this question in favor of the plaintiff, the trial court did not err in entering judgment on the verdict

CHAMPS CONVENIENCE STORES v. UNITED CHEMICAL CO.

[329 N.C. 446 (1991)]

or in denying defendant's motion for judgment notwithstanding the verdict. Thus, we reverse the Court of Appeals' holding to the contrary.

Defendant's next issue concerns the testimony of Stephen Bradley who was employed by the Buncombe County Health Department which had jurisdiction over the meat markets in Buncombe County such as the market operating at Miller's Grocery. Bradley, who was called by defendant, testified on direct examination that plaintiff did not have a license to operate a meat market. Bradley further testified on direct examination that after plaintiff bought Miller's Grocery the meat market located in the store continued to operate as an existing facility. On cross-examination, plaintiff asked Bradley:

> Q. Now, as an existing facility, isn't it true that, in your opinion, Miller's Grocery was able to continue operating as a meat market because, even though Mr. Hanvey was now operating it, it remained an existing facility?
>
> MR. MORRIS, III: Objection. That's not the law, your honor.
>
> COURT: Overruled
>
> Q. Isn't that correct?
>
> A. As far as I understand it, it was an existing facility and it would be allowed to continue to operate uninterrupted as long as it was in operation.

Defendant contends that this testimony on cross-examination was improper because it allowed "Bradley to relate to the jury his misinterpretation of the meat market rules." Defendant further claims that since the meat market was operating without a license as required by the rules governing the sanitation of meat markets, the meat market was an illegal operation and plaintiff could not recover any lost profits from its operation, which according to Hanvey's testimony was what made Miller's Grocery profitable.

[4]   The general rule is that where one party introduces evidence on direct examination, the other party is allowed to ask questions about that evidence on cross-examination to explain or rebut the testimony. *Highfill v. Parrish*, 247 N.C. 389, 100 S.E.2d 840 (1957). The original testimony about Miller's Grocery operating as an existing facility without a license to operate a meat market came during direct examination by defendant. Thus, plaintiff is allowed

to inquire about this testimony on cross-examination in order to have the witness explain what he meant during direct examination when he referred to Miller's Grocery as an existing facility even though plaintiff did not have a license issued in its name. Thus, it was not error to allow this testimony on cross-examination.

[5] Defendant also contends that the trial court should not have allowed evidence of plaintiff's lost profits because they were not proven with reasonable certainty. Defendant bases this argument on its contention that plaintiff could not recover the lost profits based on what the meat market would have brought in because the meat market was operating illegally since it did not have the proper license. Defendant claims that the evidence presented on the issue of lost profits did not provide the jury with a means of distinguishing between the profits derived from the operation of the meat market and the profits derived from the operation of the rest of the grocery store. We conclude that the fact that plaintiff did not have a license to operate the meat market does not mean that it cannot collect lost profits from the meat market operation, and therefore plaintiff was not required to separate the profits derived from the operation of the meat market from the profits derived from the operation of the rest of the grocery store in order to prove the lost profits with reasonable certainty.

While we find no North Carolina case which has directly addressed the issue of whether the failure to obtain a business license is a defense to a tort action, other jurisdictions have addressed this specific question. The majority rule is that the failure to obtain a business license is not a valid defense to a tort action. Annot. "Failure to Obtain Occupational or Business License or Permit as Defense to Tort Action," 13 A.L.R.2d 157 (1949). The lead case for this annotation is *Mueller v. Burchfield*, 359 Mo. 876, 224 S.W.2d 87 (1949), which involved a tort action based on fraud. Plaintiffs in *Mueller* purchased eggs from defendant who represented to plaintiff that the eggs were fresh and marketable. Plaintiffs were purchasing the eggs for resale; however, the eggs were not fresh, and plaintiffs lost money when they tried to resell the eggs. *Mueller v. Burchfield*, 359 Mo. at 878, 224 S.W.2d at 87. Defendant raised as a defense the fact that plaintiffs did not have a state license required for selling, dealing, or trading in eggs. *Id.* at 878, 224 S.W.2d at 88.

CHAMPS CONVENIENCE STORES v. UNITED CHEMICAL CO.

[329 N.C. 446 (1991)]

Plaintiffs in *Mueller* won a verdict at the trial court level, but the Court of Appeals reversed the judgment for plaintiffs. *Mueller v. Burchfield*, 218 S.W.2d 180 (Mo. App. 1949). The Missouri Supreme Court reversed the Court of Appeals because it had applied an incorrect rule of law. The Court of Appeals had applied a rule of contract law which states that " 'it is incumbent on a person whose right to recover on a contract is dependent on his having been licensed to plead and prove' that he complied with the requirements of the license laws." *Mueller v. Burchfield*, 359 Mo. at 878, 224 S.W.2d at 88. The Missouri Supreme Court, noting that the action before them was a tort action and not a contract action, concluded that the rule of contracts should not be applied in a tort action. *Id.* According to the court, the reason for denying relief where the plaintiff does not have the proper license in a contract action is because the court will not aid a person in enforcing a contract which he had no right to make. However, in a tort action, that reasoning "is not justified or for the public good." *Id.* at 879, 224 S.W.2d at 88. The court goes on to set out the general rule as "a defendant is not permitted in a tort action to say he is not liable because the plaintiff at the time the injury was inflicted was performing an illegal act." *Id.*

While there is authority contrary to the rule stated in *Mueller*, see *Sherman v. Fall River Iron Works, Co.*, 87 Mass. (5 Allen) 213 (1862) (plaintiff owned livery stable in violation of the law and could not recover damages for an injury to his business caused by the escape of gas through the ground and into his well water), we conclude that the majority rule is more appropriate in the present situation, and we apply it in this case. In the instant case, Bradley testified that plaintiff had been allowed to continue selling meat from Miller's Grocery as an existing facility even though plaintiff did not have a license issued in its name to sell meat at the market. Furthermore, this lack of a license had no bearing upon the loss plaintiff suffered as a result of what the jury found to be negligence on the part of defendant.

In support of its argument that plaintiff should not be allowed to recover lost profits since plaintiff did not have a license to operate the meat market, defendant cites *Gibbs v. United Mine Workers*, 343 F.2d 609 (6th Cir.), *rev'd on other grounds*, 383 U.S. 715, 16 L. Ed. 2d 218 (1966). However, *Gibbs*, which was an action for impairment of contract and involved lost profits on a hauling contract, did not involve a situation where plaintiff needed a license

CHAMPS CONVENIENCE STORES v. UNITED CHEMICAL CO.

[329 N.C. 446 (1991)]

to operate the hauling business. Rather, it was a situation where to fulfill the contract, plaintiff would have to violate the axle weight limits set out in the statutes. *Id.* at 618. Thus, *Gibbs* is not analogous to the present case.

While, as mentioned above, we find no North Carolina cases which have answered this issue, we do find support for the majority rule in dicta found in *Patterson v. Southern Railway Co.*, 214 N.C. 38, 198 S.E. 364 (1938). In *Patterson* plaintiff sued for recovery of damages to his business of hauling gasoline and kerosene. *Id.* at 39, 198 S.E. at 365. The defense to this action was that plaintiff was engaged in an illegal business and that there should be no recovery as a result. This Court concluded that under the facts of *Patterson*, plaintiff's recovery was not barred. The Court pointed out that plaintiff's hauling operation did not require a privilege license and even if it had required a license, defendants would have had no stronger defense because

the trend of authority on this subject is to the effect that when a person engages in a business without procuring a license which the State requires for the privilege, he incurs the penalties which the statutes pertaining to the license provide, and none other. The matter rests between him and the licensing authorities, and the fact that the business is carried on without license is ordinarily not available as a defense by a third party in a suit growing out of liability incurred in the course of the business, or in relation thereto.

*Id.* at 45, 198 S.E. at 368 (citing 31 C.J., page 259, section 137).

We conclude that the rationale of the majority rule, as stated in the annotation and as set out in *Patterson* is applicable to the present situation, and plaintiff is not prevented from recovering lost profits from the operation of the meat market even though no license to operate the meat market was ever issued in plaintiff's name. Since plaintiff is allowed to recover lost profits from the operation of the meat market, defendant's argument that the damages were not proven with reasonable certainty has no basis, and the trial court did not err in allowing the figures reflecting the lost profits from the entire operation of Miller's Grocery, including but not specifying what profits were attributable to the operation of the meat market, into evidence at trial.

Defendant's next issue on cross-appeal is whether the trial court erred in refusing to give defendant's requested instruction that plaintiff's note and rent payments made during the clean up operation could not be claimed as damages. Defendant contends that allowing plaintiff to recover the note payments is essentially allowing plaintiff a double recovery in that these payments were not deducted from revenues when computing lost profits. Defendant claims that the note payments should have been deducted as expenses in computing lost profits and that allowing plaintiff to not deduct the payments as an expense and then allowing plaintiff to recover the amount as a separate element of damages is a double recovery. Defendant further claims that the note and rent payments are not collectable as separate items of damage in this action because they are classified as overhead which, according to defendant, is not an item of damage in a tort case.

[6] We first address defendant's contention that the note payments were not properly deducted as expenses when computing the lost profits. We note that the rent payments were clearly denominated as "rent" on the expenses portion of the income statement, which was introduced as evidence at trial, and these payments were deducted as expenses when computing lost profits. Defendant is correct that the income statement did not include a specific category denominated as "note payments" under the expense column. However, Michael Smith, the certified public accountant who prepared the income statement at issue here and who testified at trial as an expert for plaintiff, gave a complete explanation during his testimony as to why the note payments were not deducted as an expense. During cross-examination, the following exchange took place between Smith and defendant's counsel:

Q. Why do you say that the portion of the note payments that's attributable to the principal, why is that not a proper expense?

A. Because it's reducing the note itself, and that note has been allocated between some of the items that you mentioned[:] good will, the purchase of inventory, the purchase of equipment. And so the good will is being amortized over a sixty-month period, the depreciation is being amortized — the equipment is being depreciated over a seven-year straight-line method, which in effect you wind up getting a deduction for those note repayments because you've

got a corresponding liability at the time that the business was acquired.

Smith had already testified that he used generally accepted accounting procedures when he performed the tasks required for preparing the reports presented at trial, which would include the income statement. Smith further testified that both amortization expenses which were for the amortization of good will and depreciation expenses for the equipment cost acquired when the business was purchased were deducted as expenses from the gross profits along with the other expenses in arriving at the net income figure which was used to compute lost profits. Thus, we conclude, as Smith testified at trial, that the amortization and depreciation expenses which were deducted as expenses in arriving at lost profits reflect the component parts of the note payments, and therefore there was no double recovery as asserted by defendant.

[7] In addition to claiming that plaintiff is receiving a double recovery by being allowed to collect for the rent and note payments made while the building was being repaired, defendant contends that note payments and rent payments are indirect costs of doing business, or overhead, and that overhead can be an element of damages in a contract case but not in a tort case. Defendant claims to have found no North Carolina cases allowing overhead as an item of damage in a tort case.

In a tort action the general rule in North Carolina is that a plaintiff is "entitled to recover an amount sufficient to compensate . . . for all pecuniary losses sustained . . . which are the natural and probable result of the wrongful act and which . . . are shown with reasonable certainty by the evidence." *Huff v. Thornton*, 287 N.C. 1, 8, 213 S.E.2d 198, 204 (1975) (plaintiffs allowed to recover for damage to their home as well as for loss of use of their home while it was under repair from the damage sustained when defendants' trucks struck the residence). The focus of recovery of damages in a tort action is whether the consequences were the natural and probable result of the wrong which is different from the focus in contract actions which is whether the consequences were within the legal contemplation of the parties. *Steffan v. Meiselman*, 223 N.C. 154, 25 S.E.2d 626 (1943). Thus, the scope of the recovery of damages in a tort action is more liberal than recovery in a contract action. *Id.*

CHAMPS CONVENIENCE STORES v. UNITED CHEMICAL CO.

[329 N.C. 446 (1991)]

While we, as defendant indicated, find no cases in North Carolina which specifically address the issue of whether overhead can be an item of damage in a tort case, we also find no authority which indicates that plaintiff is not entitled to recover as damages reasonable overhead expenses such as the amount spent for rent of the building and the amount paid on the mortgage while the building was under repair and plaintiff was not able to operate the business. As a result of defendant's negligence in sending the Carbo-Solv rather than the Dust Command, plaintiff was unable to operate the business to bring in the money necessary to pay these items yet these expenses accrued despite plaintiff's inability to operate the business. We conclude that these expenses were the natural and probable result of defendant's negligence and can be recovered along with plaintiff's lost profits. As noted earlier, this does not amount to a double recovery.

[8] Defendant's final issue on cross-appeal is whether the trial court erroneously refused to instruct the jury as defendant requested on mitigation of damages. Defendant requested the following instruction:

Ladies and gentlemen of the jury, the Court charges you that a party injured by the negligence of another is required to use ordinary care to see that his injury is cured and that his damages are eliminated or ended as soon as reasonably possible under existing circumstances. He must use reasonable effort to keep the harmful consequences of his injury to a minimum if he can do so by reasonable diligence. A party is not permitted to recover for damages that he could have avoided by using a means that a reasonably prudent person would have used to cure his injury and alleviate his damages.

The trial judge gave the following instruction: "The law allows the plaintiff to be compensated for a reasonable period of time that Miller's Grocery needed to be closed to make necessary repairs." The trial judge "is not required to charge the jury in the precise language of the request so long as the substance of the request is included in the language." King v. Higgins, 272 N.C. 267, 270, 158 S.E.2d 67, 69 (1967) (per curiam). We conclude that the trial judge did not err in failing to give defendant's proposed instruction on mitigation of damages in that the trial judge in substance gave the proposed instruction.

For the reasons stated above, we reverse the Court of Appeals and remand the case to that court for further remand to the trial court for reinstatement of the judgment in favor of plaintiff.

Reversed and remanded.

Justice MEYER concurring.

While I concur in the final result reached by the majority, I disagree with its reasoning in reaching that decision. The case at bar is not a product liability action and was correctly tried as an ordinary negligence action. Defendant failed in his duty to deliver the proper product about which he had given instruction as to its use, and this alone, not a defect in the product, resulted in damage to plaintiff.

N.C.G.S. § 99B-2(a) of the North Carolina Products Liability Act states as follows:

> No product liability action, except for an action for breach of express warranty, shall be commenced or maintained against any seller when the product was acquired and sold by the seller in a sealed container or when the product was acquired and sold by the seller under circumstances in which the seller was afforded no reasonable opportunity to inspect the product in such a manner that would have or should have, in the exercise of reasonable care, revealed the *existence of the condition complained of,* unless the seller damaged or mishandled the product while in his possession; provided, that the provisions of this section shall not apply if the manufacturer of the product is not subject to the jurisdiction of the courts of this State or if such manufacturer has been judicially declared insolvent.

N.C.G.S. § 99B-2(a) (1989) (emphasis added).

N.C.G.S. § 1-50(6) provides the statute of repose for actions to which chapter 99B applies. *Bernick v. Jurden,* 306 N.C. 435, 293 S.E.2d 405 (1982). This section provides that:

> No action for the recovery of damages for personal injury, death or damage to property based upon or arising out of any alleged *defect* or any *failure* in relation to a product shall be brought more than six years after the date of initial purchase for use or consumption.

N.C.G.S. § 1-50(6) (1983) (emphasis added).

CHAMPS CONVENIENCE STORES v. UNITED CHEMICAL CO.

[329 N.C. 446 (1991)]

When these two statutes are read *in pari materia*, it becomes clear that the intention of the legislature in enacting chapter 99B was to protect buyers of *defective* products. Since "condition" is not defined in N.C.G.S. § 99B-2(a), it is necessary to interpret the legislative meaning by referring to related statutes. Section 1-50(6) refers to a defect in the product itself or the product's failing in its specific purpose. Using the language of N.C.G.S. § 1-50(6) to analyze the meaning of the words "existence of conditions complained of" in N.C.G.S. § 99B-2(a), it becomes apparent that the "condition" must be a "defect or failure in relation to a product" for a product liability action to be brought under chapter 99B. In the case *sub judice*, the product itself was neither defective nor did it fail in its purpose. Rather, the defendant's delivery of the wrong product was the cause of the harm to the plaintiff.

The defendant instructed the manager of the plaintiff's store on the use of the product "Dust Command," which would help remove dust from the plaintiff's premises. However, upon promise to deliver "Dust Command," the defendant negligently delivered "Carbo Solv," a carburetor cleaner. When the plaintiff's manager received the misdelivered product, she followed the directions given by the defendant as to the use of the requested dust control cleaner. The plaintiff suffered damages as a result of the delivery of the carburetor cleaner. Because there was no statutorily required defective "condition" of the carburetor cleaner that caused the damages, no product liability action should have been allowed.

Admittedly, N.C.G.S. § 99B-1(3) defines a product liability action as including

> any action brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, testing, listing, certifying, warning, instructing, marketing, *selling*, advertising, packaging or labeling of any product.

N.C.G.S. § 99B-1(3) (1989) (emphasis added).

Although the act of "selling" may provide a cause of action under chapter 99B, this act does not automatically make it a product liability claim. "It is well settled . . . that in interpreting the meaning of a statute, all parts of a single statute will be read and construed as a whole to carry out the legislative intent." *Martin*

*v. Thornburg*, 320 N.C. 533, 547, 359 S.E.2d 472, 480 (1987). Reading the above-quoted statutes together, it is clear that in order to have a cause of action under chapter 99B, there must be a "defective" product. The action before us is simply not a "product liability action." It is an ordinary negligence action, and it was correctly tried as such in the trial division.

Prior to the enactment of chapter 99B, this Court recognized the principle that the product must be defective in order to sustain a cause of action. This Court stated that, " '[t]he necessity of proving defectiveness of the product applies no matter what theory governs the particular action.' " *Transportation, Inc. v. Strick Corp.*, 286 N.C. 235, 243, 210 S.E.2d 181, 186 (1974) (quoting 63 Am. Jur. 2d, *Product Liability* § 9 (1972) ). The Court of Appeals has also held that for a plaintiff to recover damages, he must show a defect in the product. *Sutton v. Major Products Co.*, 91 N.C. App. 610, 372 S.E.2d 897 (1988). In *Sutton*, the plaintiff failed to show that a "potato whitener" was *defective* when it left the defendant's plant, and the Court of Appeals affirmed summary judgment in favor of the defendant.

This case was correctly tried as an ordinary negligence action, and it is for that reason I vote to remand this case to the trial court for reinstatement of its judgment.